## Case No. 15,132.

UNITED STATES v. The FORRESTER.

[Newb. 81.] ¹

District Court, D. Michigan. 1856.

SHIPPING—NAVIGATION LAWS—REGISTER—LICENSE —CHANGE OF OWNERSHIP—CUSTOM—IMPORTS.

1. A distinction exists, in the navigation laws of the United States, between registered vessels and vessels enrolled and licensed for the coasting trade, as regards penalties imposed.

2. On the transfer of a registered vessel to a citizen of the United States she must be registered anew, or she loses her privileges as an American vessel; but a different penalty is imposed by the enrolling act for a neglect to renew a license granted by virtue of that act.

3. Where a vessel has been enrolled and licensed, and prior to the time limited by the license is sold to a citizen of the United States, and continues running without a renewal of her license, she becomes liable to port fees and tonnage in every port at which she may arrive, the same as vessels not belonging to the United States; but the vessel does not thereby become denationalized.

[Cited in The Gala Plaid, Case No. 5,183.]

4. The existence of a custom under which purchasers of vessels previously enrolled and licensed have awaited the expiration of the time limited in the license before obtaining a renewal of the same, would not relieve such vessels from liability to the penalty provided by the enrolling act.

5. Custom will not modify an act of congress.

6. The laws of the United States in relation to commerce and revenue use the word "import" in its commercial sense.

¹ [Reported by John S. Newberry, Esq.]

7. The importation of merchandise into the United States implies bringing the goods and productions of other countries into the United States from a foreign jurisdiction.

This was a libel of information filed on behalf of the United States, claiming a condemnation and forfeiture of the steamboat Forrester, her tackle, apparel and furniture, to the government for an alleged violation of the revenue laws. The Forrester had been duly enrolled and licensed for the coasting trade, while she was owned by E. B. Ward, a citizen of the United States. A short time after her license had been obtained she was sold by Ward to one Clement, who was also a citizen of the United States. Clement neglected to renew the steamer's license, for the reason, as it would appear, that a custom prevailed on the Western lakes and rivers of allowing vessels once enrolled and licensed to run until the expiration of their license, without regard to any change of ownership that might occur during the life of the license. It was claimed on the part of the government, that by the neglect of the purchaser to renew the vessel's enrollment and license, she ceased to be a vessel of the United States. The Forrester was engaged in the carrying of passengers and freight between Lexington and Detroit, in the state of Michigan, stopping on her trips at various ports in Canada, as well as in Michigan. On one of her trips from Lexington to Detroit, she took on board, at ports in Michigan, a quantity of shingles, wool and fish of the value of more than four hundred dollars, and carried the same to Detroit, where they were landed without a permit from the custom-house officers. On her voyage she touched, as usual, at Canadian landings, having the articles in question on board. It was insisted on behalf of the government, that this was an importation of merchandise into the United States from a foreign country, and that, as the Forrester had lost her American character by failure to obtain new license, after sale, such importation worked a forfeiture of the vessel to the government of the United States, under the provisions of the act of congress of 1817 [3 Stat. 351].

George E. Hand, U. S. Dist. Atty.

(1) By the neglect to renew the registry of the Forrester, after sale, she ceased to be a vessel of the United States. Act 1792, § 14 (1 Stat. 294). See this doctrine fully illustrated in U. S. v. Willings, 2 Pet. Cond. R. 20, 23. True, this act speaks of registered vessels, but vessels enrolled and licensed under act of 1831 (Gord. Dig. 773; 4 Stat. 487, § 3) are liable to the rules and regulations and penalties relating to registered vessels, and such is the construction held by the treasury department. As to what constitutes a United States vessel, see Act 1792, § 1 (1 Stat. 287, 288; Gord. Dig. 713, § 2478). No other vessels are qualified for the coasting trade or fisheries. Act 1792, § 4 (Gord. Dig.

715, § 2484; 1 Stat. 289), shows what is necessary to obtain a registry; and like qualifications and requisites are necessary for the enrollment as for the registry of vessels. See Act 1793, § 2 (1 Stat. 305; Gord. Dig. 771, § 2678). The Forrester having thus lost her American character by failure to obtain new license after her sale to Clement, and not being a vessel of any other country, by the act of importation of goods into the United States from Canada, a foreign province, became forfeited to the United States by Act 1817, §§ 1, 2 (3 Stat. 351; Gord. Dig. 713, §§ 2475, 2476).

(2) Was there an importation of goods by the Forrester? She came from a Canadian port into Detroit with goods on board. It may be said that there is evidence, on behalf of the claimant, that the goods in question were all shipped from American ports. If that were so, it would not save the forfeiture of the vessel. The goods were imported from Canada into the United States by the Forrester, she not being a vessel of the United States at the time. A voluntary bringing from a foreign country is an importation. The Boston [Case No. 1.670]; 3 Pet. Cond. R. 299; U. S. v. Lyman [Case No. 15,647; Dunl. Adm. Prac. 245. The act of congress of 1848 (9 Stat. 232; Gord. Dig. 770) evidently contemplates that every bringing of goods from a foreign place is an importation, and contains important provisions based on that assumption, as. for example, that foreign goods. on which duties have once been paid, should not, if shipped at an American port in a vessel that touched at a foreign port, thereby again be made to pay duty. If the goods were brought from Canada into the United States it is quite immaterial how the goods came to be in Canada. In whatever way they came to be there, they are, nevertheless, goods imported into the United States from a foreign place, not in a vessel of the United States or of Great Britain, within the act of 1817. The statute makes no distinction in favor of goods of American growth or origin. Whenever a distinction between goods of domestic and foreign production was intended, it is expressed in the statutes. Thus, in Act 1793, § 6 (1 Stat. 307), a vessel offending having domestic goods or products on board, is exposed to tonnage duties, but if the goods are of foreign growth or production the vessel is forfeited. Act 1831, § 3 (4 Stat. 487), uses the disjunctive or, and authorizes a vessel, under the same papers, to be employed, "either in the coasting or foreign trade," but does not authorize a vessel to be engaged in both trades at the same time; and trips made under that act to and from American and Canadian ports, are strictly foreign voyages, and must be conducted as such; and goods taken from an American to a Canadian port, and thence returned to an American port, must be treated the same as goods taken from New York to Liverpool and thence back to New York. The act of May 27, 1848 [9 Stat. 232], for the first time permitted the same vessel to be engaged. at the same time, in coasting and foreign trade, and that only on compliance with the proviso in the first section of the act. And this act treats every vessel that has "touched" at a foreign port as coming from a foreign voyage, for she must conform to the laws touching manifests of cargo and passengers, "and all other laws regulating the report and entry of vessels from foreign ports, and be subject to all the penalties therein prescribed." And in case a vessel does not comply with the terms of the proviso to section 1, she enjoys no privilege under this statute. The second section of this act provides that all vessels and their cargoes engaged in the trade referred to in the act, "shall become subject to existing collection and revenue laws, on arrival at any port in the United States." Such an arrival is clearly treated as an arrival from a foreign port, and "the collection and revenue laws" referred to, are none other than the existing collection and revenue laws pertaining to foreign trade; and it is to save certain classes of goods from the operation of "existing collection and revenue laws," to which they are made subject by the first clause of said second section, that the proviso thereto is introduced. saving those from import duties, to which, without such proviso, the "existing collection and revenue laws" would have subjected them. The "touching at foreign ports," alluded to in this act, is evidently intended as equivalent to entering a foreign port for the purpose of landing, and taking in thereat, merchandise, passengers, &c., which is making port for all commercial purposes, as fully as though such port was the only port of destination; and the arrival of a vessel from a foreign port so "touched at," is treated by this statute throughout as an arrival from a foreign country, and the cargo brought in such vessel is treated as imported from a foreign country and made subject (except when saved by the proviso to the second section) to the collection and revenue laws applicable to cargoes imported from foreign countries. The fact that the Forrester made certain Canadian ports, for all commercial purposes mentioned in the statutes, must, upon her departure thence and arrival in a port of the United States, bring her cargo within the statute definition of "imported"; and this, more especially when she came from a foreign, to a port of the United States, without the privileges conferred by the act of 1848.

(3) The bringing into the United States, by a vessel, from a foreign port, goods of the value of $400, and landing the same without a permit, is a distinct cause of forfeiture from the last, whether the importation be in American or foreign vessels, and whether the goods be dutiable or free. See Act 1799, § 50 (1 Stat. 665). The language of this statute is very explicit. The bringing from a foreign place and landing without permit, covers the whole ground.

John S. Newberry, for claimant.

(1) Act 1792, § 14, cited for the government, refers to registered vessels, and so far as this statute is concerned, it is sufficient to say that the Forrester never was a "registered" vessel. She is an "enrolled and licensed" vessel; and there is a broad distinction running through the laws in relation to the two classes of vessels. Assuming that the Forrester was subject to the act in relation to "registered" vessels, the district attorney, in support of his proposition, that a new registry must be obtained, at the time of the vessel's transfer, cites the case of U. S. v. Willing. 2 Pet. Cond. R. 20. This case, however, only decides that a new registry shall be taken out "within a reasonable time," and the facts of each case must decide what is the "reasonable time," and we insist, in behalf of the Forrester, from the evidence in the case, that her new papers were taken out within a reasonable time after the transfer. In order to connect "enrolled and licensed vessels," with the act of 1792, the act of 1831 (4 Stat. 487), is cited. This act provides that a vessel enrolled and licensed on our northern frontier, "shall be liable to the rules, regulations and penalties, now in force, in relation to 'registered vessels,' on our northern, northeastern and northwestern frontiers." Now, we ask, what are the regulations in force on the frontiers described in relation to registered vessels? There are none. See Conk. Prac. (Ed. 1842) 329. On page 230 of the same book, two instances are cited to show that "enrolled" vessels, and "registered" vessels are not subject to the same provisions. There being no laws in force as to registered vessels on our northern, northeastern and northwestern frontiers, except certain general laws which are of no importance in this case, we must look to other sources for the regulations in reference to enrolled and licensed vessels. The license itself shows under what laws the vessel is enrolled and licensed; they are the enrolling act of 1793, one passed in 1831, &c., &c. The Forrester was authorized to run under those acts, and in them are contained the regulations and penalties to which she is subject. In none of the acts referred to in the license, is there any provision that a transfer of a vessel, accompanied with an omission to take out new license, causes the vessel a forfeiture of her American character. There is a provision, however (section 5, Act of 1793), that by such transfer the license becomes void; and section 6 of the same act then provides that a vessel trading without license, becomes subject to port and tonnage duties, but this is the only penalty. Again, section 2 of enrolling act (1 Stat. 308) is cited on behalf of the government, which provides that vessels to be enrolled shall possess the same "qualifications and requisites" as are necessary for vessels to be registered. Now, this section does not enact that the licensed vessel shall

be subject to all the "provisions" governing registered vessels. It simply refers to the qualifications, character, &c., of the vessel, prior to the enrollment; it has no reference to penalties, rules, &c., after enrollment.

(2) The Forrester is charged with "importing goods contrary to the true intent and meaning of the act of 1817;" she is charged with "importing goods from a foreign country." It matters not what may have been the character of our vessel, unless we have been guilty of "importing goods," thereupon, "from a foreign country contrary to the true intent and meaning of the act of 1817." We leave the meaning of that sentence to its usual, simple and commercial construction. We leave it for the court to decide, whether, under the facts of this case, there was an importation from a foreign country, in the true intent and meaning of the act of 1817, on board the Forrester, or not. She had the right to touch at foreign ports. 9 Stat. 232. This is conceded on behalf of the government; and it is also conceded that congress, in its legislation, has acted upon the supposition, that domestic goods might go into a foreign port, and be afterwards landed in American ports, without being liable to duty. Why, then, should we be condemned for acting under the same inference and supposition as congress itself? We contend: (1) That by no act on the part of the Forrester, has she lost her American character, or the privileges of an American vessel. (2) We have not been guilty of importing goods from a foreign country, contrary to the true intent and meaning of the act of 1817.

WILKINS, District Judge. This steamer was seized by the collector of the port of Detroit, for a violation of the revenue laws, on the 18th of October, 1854. The libel informs the court, that, at the time of the seizure, "she was not a vessel of the United States; nor a foreign vessel belonging to citizens of the country, from which the merchandise imported in her, at the time of seizure, were first shipped for transportation, or, of the growth, production or manufacture of that country." And also, "that her cargo, consisting of 10 barrels of fish, 128 bunches of shingles, and 25 bales of wool, being merchandise subject to duty, was brought and imported from a foreign place, viz. the province of Upper Canada, into the United States, at the port of Detroit." The answer of S. Clement, claimant, denies the allegations of this information, both as to the character of the vessel, and the importation charged, and sets forth that she was at the time, duly enrolled and licensed at the port of Detroit, and that the merchandise specified was not imported into the United States from a foreign place, but was shipped from ports and places within the United States.

It was in proof, on the trial of the issue thus made in the case, that the Forrester was built at Newport, in this state, by E. B.

Ward, in the month of June, 1854, and was by him enrolled and licensed for the coasting trade, on the 6th day of July following, "for one year from that date"; that on the 12th of July of the same year, only six days subsequent to her enrollment, Ward sold the Forrester to Clement, the conveyance being witnessed by the deputy collector of the port of Detroit, and placed on record in a book in the office, provided for that purpose, called volume A, on page 534; that Clement, the claimant of the Forrester, was at the time, and is still a citizen of the United States; that during the summer of 1854, the route of the Forrester, in navigating the rivers Detroit and St. Clair (a line through the middle of which streams constitutes the national boundary line between the Canadas and the United States), was from Port Huron, St. Clair county, to the port of Detroit; that in her trips she always touched at Port Sarnia and at Baby's Point, villages in the province of Canada, on the east bank of the St. Clair river, for the reception of passengers, baggage and whatever freight might offer; that on her downward trip from Port Huron on the 13th of October, 1854, the fish specified in the libel, was shipped from Port Huron, the wool from St. Clair, and the shingles from Lexington, all consigned to the port of Detroit, these ports being American ports, within the United States; that on the said downward trip, she stopped, as usual, for freight and passengers, at Ports Sarnia and Baby's Point, but took no freight in at either of those places, and that the fish, wool and shingles were not taken from the Forrester from the time they were shipped until they were landed at Detroit, but remained in the hold of the vessel, the steamer only remaining for a few minutes at the Sarnia and Baby wharves, and on the trip in question receiving no additional freight at those ports; that no other freight was landed at Detroit on the 13th of October, 1854, from the steamer, but the enumerated articles described in the libel; that no new license was taken out for the Forrester by Clement, the purchaser from Ward, nor had she been enrolled since the sale, but shortly after the vessel had been seized, Clement called at the customhouse and made application for a new license and enrollment, which was then refused.

With this demonstration in support of the answer, the government seeks the forfeiture of the goods and the vessel, on two grounds: (1) That the steamer forfeited her American character and lost her privileges as an American ship, in consequence of the neglect to enroll her anew · after her sale, to Captain Clement. (2) That her cargo, landed and seized at Detroit, was merchandise imported from the adjacent province of Canada. There is a very obvious distinction made in the law regulating the collection of the revenue of the United States, between registered vessels and vessels licensed and enrolled. The first class is governed by the act of December 31, 1792, entitled "An act concerning the registering and recording of ships or vessels," and its provisions were designed to apply to vessels engaged in foreign commerce. The second class is governed by the act of the 18th of February, 1793, entitled "An act for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same," and the various subsequent statutory amendments, embracing only vessels in the coasting trade on the Atlantic, and on the northern, northeastern and northwestern frontier waters of the United States. Both statutes were enacted during the same session of congress; and both classes of vessels are restricted, by their respective certificates of registry, and their licenses of enrollment, to the species of navigation and trade described and defined in these documents respectively.

But it is contended that the second section of the enrolling act adopts the provisions and penalties of the registry law. In many respects the two statutes differ, and such enactment, on the very threshold of the statute, if so construed, would render much of the remaining thirty-two sections nugatory and unnecessary. For instance—by the sixteenth section of the registry law, the failure to report a sale to a foreigner works a forfeiture of the vessel; and by the thirty-second section of the enrolling act, the sale of a licensed vessel to a foreigner, whether reported or not, absolutely forfeits the vessel and her cargo. The provision is positive, "if any licensed ship or vessel shall be transferred to any person not a citizen of the United States, the vessel and her cargo shall be forfeited." Here the penalty is imposed on the forbidden act; while in the sixteenth section of the registry law the penalty attaches, not to the act of sale, but "on the neglect to make the same known" in the way indicated in the act. · The same penalty is applied, but not under the same circumstances; the sale in the first being the penal misconduct, and the failure to report, the cause of forfeiture in the other. It is considered, therefore, that the provision of this second section of the enrolling act, is merely directory to the public functionary by and before whom the enrollment is to be made, as preliminary to the grant of the license. This is clearly inferable from the language employed. The section declares that "in order for the enrollment of any vessel, she shall possess the same qualifications, and the same requisites in all respects, shall be complied with, as are made necessary for registering ships by the registry law; and the same duties are imposed on all officers, with the same authority, in relation to enrollments, and the same proceedings shall be had in similar cases touching enrollments."

The same qualifications, the same requisites in all respects, and the same proceed-

ings in similar cases, are directed to be observed; but which by no means embrace the penalties of the first act, as applicable to the cases of dereliction enumerated in the second. By the first law, on certain pre-requisites, a certificate of registry is to be given; and by the second, on the performance of similar acts, an enrollment is perfected, and a license obtained. But certainly it would be a forced construction so to interpret these words as to make the penalty prescribed on the omission, under the first statute to re-register, apply to the neglect to re-enroll and re-license. The fourteenth section of the registry law directs "that when any ship or vessel, which has been registered, shall be sold to a citizen of the United States, the said ship must be registered anew by her former name, otherwise she shall cease to be deemed a ship of the United States. And in every case, if she shall not be so registered anew, she shall not be entitled to the privileges of a vessel of the United States." And the sixth section of the enrolling act provides that "every ship found trading between different places in the same district, without enrollment or license as provided in the act, shall pay the same fees and tonnage in every port at which she may arrive, as vessels not belonging to citizens of the United States." Where a vessel has once been enrolled and licensed, and before the expiration of the time limited in the license, is sold to a citizen of the United States, and continues running without a renewal, she certainly occupies in relation to the law, the position indicated, of "a vessel trading without enrollment or license as provided in the act," and is amenable to the special penalty imposed, but to no greater. But "ceasing to be a vessel of the United States," and losing all the privileges of such, as a penalty, widely differs from being made liable to port fees and tonnage at every port she arrives at. In the one case, she loses her national character, and the protection which her certificate affords: in the other, she is made responsive to additional pecuniary obligations.

The object of both statutes, is the protection of the revenue against fraud, to encourage American enterprise, to preserve the rights of the citizen trader, to confine both classes of vessels to the restrictions imposed by their title papers, and to secure the collection of the public dues without confusion; notwithstanding the various transfers to which this species of property is ever subject during the season of navigation. In the commerce on the ocean with foreign nations, a voyage might continue for a year and more, before a return to the home port. In such cases, greater strictness was deemed essential, than in those of domestic trade on the coast, and on the lakes and rivers of the north, the northeast and northwestern frontier. When sold to a foreigner, the registered vessel, therefore, forfeited her national char-

acter, and when sold to a citizen, the same consequence ensued, unless the old registry was surrendered, and the vessel re-registered, according to her change of title. The intention is manifest. Why should a privilege solely conferred upon a citizen, be surreptitiously used with impunity by a foreigner? The same necessity did not exist in regard to the other class; it was not to be presumed that foreigners could successfully compete with citizens in the domestic trade, and the exigency did not demand the forfeiture by the American ship of her privileges of national character. So far, therefore, as the registry and enrolling statutes are applicable to the question of the penalties imposed by each, no embarrassment is felt in deciding, that the neglect to renew the license, does not denationalize the domestic vessel engaged in the navigation of our inland frontier waters. The question then arises, how far the subject is affected by the third section of the act of the 2d of March, 1831, which declares "that any vessel of the United States, navigating the waters on our northern, northeastern and northwestern frontiers, shall be enrolled and licensed in such form as may be prescribed by the secretary of the treasury; which license shall authorize the vessel to be employed either in the coasting or foreign trade, and no certificate of registry shall be required for vessels so employed on said frontiers: Provided, that such vessel shall be in every other respect liable to the penalties now in force relating to registered vessels on our northern, northeastern and northwestern frontiers."

Now, this proviso expressly embraces the penalties in force in 1831. relating to registered vessels navigating the northern, northeastern and northwestern frontiers. There is no escape from this conclusion. If then the penalty in question, namely, the forfeiture of national character and privilege, was applied at that time by any known provision of law, to licensed vessels; if this class was then, in that respect, synonymous with the former, this express language must control the court, whatever construction is given to the acts of 1792 and 1793. But, in vain it may be asked to what then existing penalties does the proviso refer? Not to the penalty prescribed in the old registry law; for that only applied to vessels engaged in foreign commerce. Not to any new penalty created since 1792, and prescribed to vessels registered for the inland trade. If so, where are they to be found? Professional research and judicial examination alike fail in their efforts to discover them. The difficulty can only be solved by that which seems (from taking the whole law into consideration), to have been the manifest intention of this act; and such clearly was, to enlarge in order to meet the growing wants of western commerce, the privileges of licensed vessels navigating the waters which form our northern, northeastern and northwestern national boundary, and en-

able them to engage in foreign and domestic commerce at one and the same time, under one set of papers, namely the enrollment and license, without the formality of a registry, and not exacting the restrictions, or enforcing the penalties imposed on registered vessels.

The case at bar exhibits the vessel which has been seized, as originally built and owned by a citizen of the United States, regularly enrolled by him, and having a license procured for the coasting trade covering one year from its date; and that, on the 13th of October, 1854 (a little better than two months after), she was seized for an infraction of the revenue laws, charged with the importation of foreign merchandise from a foreign port. Shortly after her enrollment by her owner, she was sold to the claimant, who was a citizen of the United States, of which sale the revenue officer was cognizant. Her purchaser neglected the renewal of her license, not deeming it necessary inasmuch as a custom prevailed, for purchasers of such vessels to await the close of navigation before any application for renewal. Under such circumstances, did this vessel lose her national character as a vessel of the United States? We think not. The registry penalty does not apply. But the penalty directed by the sixth section of the enrolling act, could with propriety have been enforced. The custom alluded to would constitute no defence. It was not a custom but a toleration, and as such was extended by the functionaries of the government to the owners of licensed vessels, but could not modify the law; nor would the time allowed be considered as the "reasonable time" comprehended by Chief Justice Marshall in the case of U. S. v. Willings [supra].

But, independent of this construction of the navigation acts, the libel must be dismissed, because the facts in proof do not amount to an importation within the true meaning and spirit of the act of March 1, 1817. That act specifies as an "importation" merchandise brought into the United States from any foreign port or place. The term used is "import" and legislation employed that term in its commercial sense, which is to "bring" from a foreign jurisdiction into this jurisdiction, merchandise not the product of the country. Its commercial meaning is directly contrary to the term "export." Both phrases have a technical meaning in the law. We "import," teas from China, wines from France. We "export" cotton, tobacco, pork and wheat. The one term signifies etymologically "to bring in," the other "to carry out." The act itself defines the word, viz. "brought into from any foreign port or place." It is in proof that the articles enumerated in the libel, "fish, wool and shingles," were shipped from American ports, within this district, and by respective bills of lading consigned to merchants in Detroit. When the goods were shipped they were stowed away

and never removed until they reached their destination. Now, is the meaning of the word "import" to be changed under these circumstances, simply because the vessel freighted with these productions, and engaged in the navigation of the rivers St. Clair and Detroit, temporarily stopped on her downward voyage at Canadian ports for the purpose of receiving in the usual business of a steamer additional passengers and freight, or to take in fuel? Such would not be a fair, just and reasonable construction of the law, the chief intention of which is the imposition of duties, for the support of government, on foreign commerce. The literal signification of the words contained in the law does not admit of such an interpretation; it is contrary to the known policy of the navigation laws.

This libel must, therefore, be dismissed. But although there was no evidence to justify the condemnation of the vessel, yet the seizure was made under circumstances which warranted the suspicion of the officer, that the cargo discharged was imported from Port Sarnia in Canada. The captain called the merchandise "Port Sarnia stuff," and the vessel not having renewed her license under her new owner, and the doubt which existed as to her character, made it the duty of the officer to make the seizure. Libel dismissed, with certificate of probable cause.